# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| CENTER FOR ARMS CONTROL AND NON-PROLIFERATION, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) ) | Civil Action No. 05-682 (RMC) |
| V. PHILLIP LAGO, Executive Secretary of the National Security Council, | ) ) ) ) ) | |
| Defendant. | ) ) | |

## MEMORANDUM OPINION

The Center for Arms Control and Non-Proliferation ("Center") exists to educate Congress and the public regarding the elimination of nuclear weapons.  It is intensely interested in the materials that the Commission on the Intelligence Capabilities of the United States Regarding Weapons of Mass Destruction ("Commission") used in developing its report to the President.  The Commission, however, promptly dissolved after submitting its report on March 31, 2005, and its documents were transferred to the National Security Council ("NSC") within the Executive Office of the President.  Therefore, the Center sues V. Phillip Lago, Executive Secretary of NSC, in mandamus, alleging that the Commission violated the Federal Advisory Committee Act ("FACA"), 5 U.S.C. app. 2 (2000), during its short life span and that Mr. Lago, as custodian of Commission documents, must remedy that violation by providing access to the Commission's background materials.  Mr. Lago argues that he owes no duty to the Center and asserts that the Court has no jurisdiction over the claim.  For the reasons stated below, the Court does not agree with Mr. Lago's

arguments.  The complaint will be dismissed, however, because the Court concludes that the

Commission was not covered by FACA in the first place.[1]

## I.  BACKGROUND FACTS

President George W. Bush established the Commission by Executive Order 13328

dated February 6, 2004.  Its purpose was twofold: (1) to examine the Intelligence Community's[2] prior

assessments of weapons of mass destruction ("WMD") in Iraq, Libya, and Afghanistan; and (2) to

examine the Intelligence Community's current capabilities to confront WMD and related threats of

the 21st Century.  The President directed the Commission to submit a report on its findings and

recommendations by March 31, 2005.  The President further directed that the "Central Intelligence

Agency and other components of the Intelligence Community shall utilize the Commission and its

resulting report."  E.O. 13328 ¶ 2(d).  The Commission was ordered to terminate all operations

"within 60 days after submitting its report."  *Id.* ¶ 8.

The Commission presented a 692-page classified report to the President and released

a 601-page unclassified version to the public.  The Commission ceased to function on May 27, 2005,

and all remaining Commission personnel tendered resignations on that date.  *See* Decl. of Arthur

---

[1]  Defendant's Motion to Dismiss is based on lack of jurisdiction under Rule 12(b)(1); his
supporting memoranda do not mention Rule 12(b)(6).  In response to the Court's request for
supplemental briefing, however, Defendant filed a brief arguing that FACA did not apply to the
Commission and that the Complaint should be dismissed on that basis.  Although Defendant's
supplemental brief fails to mention Rule 12(b)(6) expressly, the Court finds that Rule 12(b)(6) is the
proper rule for addressing this argument. *Cf. Arbaugh v. Y & H Corp.*, 126 S. Ct. 1235, 1242-44
(2006) (discussing the difference between lack of subject-matter jurisdiction under Rule 12(b)(1),
and "'a plaintiff's need and ability to prove that the defendant [is] bound by the federal law as the
predicate for relief—a merits-related determination'" that implicates Rule 12(b)(6)) (quoting 2 J.
Moore, et al., *Moore's Fed. Practice* § 12.30[1], p. 12-36.1 (3d ed. 2005)).  Because the Court agrees
with Defendant's supplemental argument, it will grant the Motion to Dismiss under Rule 12(b)(6).

[2]  The phrase "Intelligence Community" is defined at 50 U.S.C. § 401a(4).

Jones (Ex. 1 to Dkt. # 3), ¶ 2.  Also on that date, the Commission transferred, as presidential records, all documents in its possession or control to the NSC.[3]

The Center filed its original complaint against the Commission and Vice Admiral (Ret.) John Scott Redd, the Commission's Executive Director, on April 6, 2005, seven days after the Commission submitted its report to Congress.  The complaint was served almost one month later, when the Commission had barely a month before its pre-ordained dissolution.  The Defendants filed a motion to dismiss in July 2005.  In December 2005, the Center filed an amended complaint, adding Stephen Hadley, who is the Assistant to the President for National Security Affairs, as a third defendant in the case.  This Court granted the motion to dismiss the Commission and Vice Admiral (Ret.) Redd on December 15, 2005, but declined to address the claims against Mr. Hadley.[4]  *See Ctr. for Arms Control & Non-Proliferation v. Redd*, 2005 WL 3447891, No. 05-682, at *1 n.1 (D.D.C. Dec. 15, 2005).  A renewed motion to dismiss has now been fully briefed.

## II.  LEGAL STANDARDS

Defendants have moved to dismiss the case under Fed. R. Civ. P. 12(b)(1) for lack of jurisdiction.  On a motion to dismiss pursuant to Rule 12(b)(1), the plaintiff bears the burden of establishing that the court has subject-matter jurisdiction.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  When faced with a facial challenge to subject matter jurisdiction under Rule

---

[3] The NSC is a council established "to advise the President with respect to the integration of domestic, foreign, and military policies relating to the national security . . . ."  50 U.S.C. § 402(a).  The council is within the Executive Office of the President, *see* Reorganization Plan of 1949 No. 4, 5 U.S.C. app. 1, and is composed of the President, the Vice President, the Secretary of State, the Secretary of Defense, and other senior executive officials, *see* 50 U.S.C. § 402(a).  Mr. Lago is the civilian executive secretary who heads the NSC staff.  *See id.* § 402(c).

[4] The complaint on its face still names Mr. Hadley but the parties stipulated, on January 12, 2006, to the substitution of Mr. Lago because he is the statutory head of the NSC staff.

12(b)(1), the Court applies substantially the same standard of review that is used to evaluate motions under Rule 12(b)(6). *See Vanover v. Hantman*, 77 F. Supp. 2d 91, 98 (D.D.C. 1999). The court must accept as true all of the plaintiff's well-pled factual allegations and draw all reasonable inferences in favor of the plaintiff; however, the court does not need to accept as true the plaintiff's legal conclusions. *See Alexis v. District of Columbia*, 44 F. Supp. 2d 331, 336-37 (D.D.C. 1999). But because a Rule 12(b)(1) motion challenges the court's power to hear the claim, the court must give the plaintiff's factual allegations closer scrutiny than would be required for a Rule 12(b)(6) motion for failure to state a claim. *Macharia v. U. S.*, 334 F.3d 61, 64, 69 (D.C. Cir. 2003). Moreover, the court is not limited to the allegations contained in the complaint; it may consider materials outside the pleadings to determine whether it has jurisdiction. *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992). The court may dismiss a complaint for lack of subject-matter jurisdiction only if "'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Empagran S.A. v. F. Hoffman-Laroche, Ltd.*, 315 F.3d 338, 343 (D.C. Cir. 2003) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).

## III.  STATUTORY PROVISIONS

FACA was "born of a desire to assess the need for the 'numerous committees, boards, commissions, councils, and similar groups'" that advise different portions of the Executive Branch — and that cost large sums of money. *Pub. Citizen v. U. S. Dep't of Justice*, 491 U.S. 440, 446 (1989). Its purpose is to ensure that new advisory committees be established only when essential and that their number be minimized; that they be terminated when they have outlived their usefulness; that their creation, operation, and duration be subject to uniform standards and procedures; that Congress and the public remain apprised of their existence, activities, and cost; and

that their work be exclusively advisory in nature.  *Id.*  For these purposes, advisory committees subject to FACA must file a charter, keep detailed minutes of their meetings, provide advance notice of their meetings, open meetings to the public absent a determination that the meeting may be closed in accordance with the Government in the Sunshine Act, make publicly available their records and other documents, be fairly balanced in membership, operate within regulatory guidelines promulgated by the General Services Administration, and terminate no later than two years after establishment unless specifically authorized to continue.  5 U.S.C. app. §§ 9(c), 10(a)-(c), 5(b)(2), 7 and 14(a).  Certain committees are expressly exempt from FACA's requirements, including committees composed wholly of officers or employees of the federal Government, *id.* § 3(2)(c), and committees established or utilized by the CIA, *id.* § 4(b)(1).

## IV.  ANALYSIS

The Center complains that the Commission failed to comply with FACA § 10(c), which requires "[d]etailed minutes of each meeting of each advisory committee" to be kept.  Am. Compl. ¶¶ 23-25.  It also complains that the Commission failed to comply with § 10(b), which mandates that advisory committees make available for public inspection and copying "the records, reports, transcripts, minutes, appendices, working papers, drafts, studies, agenda, or other documents which were made available to or prepared for or by each advisory committee . . . ."  *Id.*  Finally, the Center complains that the Commission failed to comply with § 11(a) of FACA, which requires that transcripts from agency proceedings be made available to the public.  *Id.*  Mr. Lago seeks dismissal of these claims based primarily on a theory that, for a number of reasons, the claims are not justiciable.

A.        **Jurisdiction, Standing, & Mootness**

Mr. Lago challenges this Court's jurisdiction on a variety of bases.  Specifically, he contends that he did not owe a duty to the Center under FACA and, as a result: (1) there is no jurisdiction under the Mandamus Act, 28 U.S.C. § 1361; (2) principles of sovereign immunity deprive the Court of subject-matter jurisdiction; (3) the Center has no standing; (4) and the Court is without jurisdiction to grant declaratory relief.  *See* Mem. of P&A in Supp. of Def. V. Phillip Lago's Mot. to Dismiss ("Def.'s Mem.") at 3.  Mr. Lago also contends that the Court lacks jurisdiction because the Center's claim under FACA § 10(b) is moot inasmuch as the Commission no longer exists.  *Id.* at 4.

Taking the final point first, Mr. Lago places great emphasis on the last phrase of FACA § 10(b), which provides that the records and other materials of an advisory committee shall be available for public inspection "until the advisory committee ceases to exist." Def.'s Mem. at 17. He argues that the dissolution of the Commission terminated any § 10(b) obligation, if one ever existed.  *Id.*  But this argument is directly contradicted by controlling precedent.  The D.C. Circuit Court of Appeals has "made it clear that FACA rights are enforceable even after an advisory committee has been disbanded." *Cummock v. Gore*, 180 F.3d. 282, 292 (D.C. Cir. 1999) (citing *Byrd v. EPA*, 174 F.3d 239, 343-44 (D.C. Cir. 1999)).  The issue is not the continued existence of the Commission; it is the continued existence of the documents. *Judicial Watch, Inc. v. Nat'l Energy Policy Dev. Group*, 219 F. Supp. 2d 20, 30 (D.D.C. 2002) ("The federal government's statutory duty under FACA to allow the public to inspect and copy documents may be limited in time by the statute, but the ability of a court to award access to the documents as relief for previous violations of that duty is limited only by the existence of the documents."), *aff'd sub nom. In re Cheney*, 334 F.3d 1096

(D.C. Cir. 2003), *rev'd on other grounds*, 524 U.S. 367 (2004).[5]  The Center's claim clearly is not moot.

Moving to the question of jurisdiction, the Court concludes that the Center has standing to seek the records.  Although FACA does not contain a provision providing a private right of action to enforce its provisions, it appears that the Supreme Court has essentially assumed that citizens may sue if they have been denied access to records under FACA.  *See Manshard v. Fed. Judicial Qualifications Comm.*, 408 F.3d 1154, 1156 n.3 (9th Cir. 2005) (citing *Pub. Citizen*, 491 U.S. 440).  Nonetheless, the Center still must show "that [it] has suffered a particularized injury to a cognizable interest, [its] injury is fairly traceable to the Government's actions, and a favorable judicial ruling will likely redress [its] injury."  *Cummock*, 180 F.3d at 290 (citing *Lujan*, 504 U.S. at 560-61).  There can be no doubt that "refusal to permit [the Center] to scrutinize the [Commission's] activities to the extent FACA allows constitutes a sufficiently distinct injury to provide standing to sue."  *Pub. Citizen*, 491 U.S. at 449.  Thus, the Center suffered an injury to a cognizable legal interest when the Commission denied its requests for background materials.  This injury was directly caused by the alleged violation of FACA and is redressable by a court order allowing access to the materials.  *See Byrd*, 174 F.3d at 244 (noting that plaintiff had standing to obtain a declaratory judgment that the agency failed to comply with FACA, although documents had already been released after advisory committee completed its work).

---

[5]  Mr. Lago suggests that the decision in *National Energy Policy Development Group* advances "no persuasive justification" for its reading of § 10(b).  Def.'s Mem. at 19.  To the contrary, binding decisions of this Circuit, cited in the text, are quite clear that the dissolution of an advisory committee does not bar a member of the public from obtaining background materials that were improperly withheld in violation of FACA.

It is also clear that Mr. Lago is the appropriate defendant to stand in the stead of the now-defunct Commission. *See* Def.'s Mem. at 15-16. Mr. Lago has been proffered by Government stipulation as the custodian of the documents and the person within the Executive Office of the President who is responsible for them. Therefore, it is not dispositive that neither Mr. Lago nor NSC is covered by FACA; it is enough that the Commission refused to release its background materials upon request, and that the appointing authority — the President — still retains those materials in the custody of Mr. Lago.

Moving to Mr. Lago's next point, sovereign immunity does not bar the Center's suit. As in *Washington Legal Foundation v. U.S. Sentencing Commission*, 89 F.3d 897, 901 (D.C. Cir. 1996), the *Larson-Dugan*[6] exception to sovereign immunity allows the Center to "seek[ ] a writ of mandamus to force a public official to perform a duty imposed upon him in his official capacity . . . ." Again, the issue is whether the *Commission* was covered by FACA, not whether Mr. Lago or NSC, who are mere custodians of Commission records, are covered by FACA. If the Commission was covered, it had an obligation to release all background materials before or at the time of its meetings. *Cummock*, 180 F.3d at 291 ("in order to give meaning to FACA's sunshine provisions, § 10(b) must be read to impose an affirmative obligation on the Government to, 'whenever practicable, [provide] access to the relevant materials before or at the meeting at which the materials are used and discussed.'") (quoting *Food Chemical News v. Dep't of Health & Human Servs.*, 980 F.2d 1468, 1472 (D.C. Cir. 1992)). "Section 10(b) contains unambiguous language that identifies certain materials, and describes in detail the methods and location by and at which the Government

---

[6] *See Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689 (1949); *Dugan v. Rank*, 372 U.S. 609, 621-22 (1963); *see also Chamber of Commerce v. Reich*, 74 F.3d 1322, 1329 (D.C. Cir. 1996).

must make those materials available to the public." *Food Chemical News*, 980 F.2d at 1472.  Any

advisory committee operating under FACA has no discretion or choice in the matter.

> All the foregoing assumes, of course, that FACA applied to the Commission:

> > Whether the *Larson-Dugan* exception applies to this case depends upon whether the Government has a duty to the plaintiff, *viz.* to allow it access to certain government records.  The Government denies that it has such a duty, and that is the only basis upon which it resists application of the *Larson-Dugan* exception. . . . [T]he question of jurisdiction merges with the question on the merits . . . .

*Washington Legal Found.*, 89 F.3d at 901-02.   Thus, Mr. Lago's justiciability arguments —

sovereign immunity, standing, and so on — are auxiliary to the ultimate question on the merits: did

the Commission owe a duty to the Center under FACA.  For this reason, the Court ordered additional

briefing on whether FACA applied to the Commission's activities.

### B.      The Merits: FACA's Applicability to the Commission

There can be little doubt that the Commission qualified as an "advisory committee"

under FACA § 3 — it was a "commission" "established by the President" for the purpose of

providing "advice and recommendations."    However, FACA expressly exempts from its

requirements advisory committees that are "established or utilized" by the CIA.  *See* FACA § 4(b)

("Nothing in this Act shall be construed to apply to any advisory committee established or utilized

by – (1) the Central Intelligence Agency").   Executive Order 13328 specified that "[t]he Central

Intelligence Agency and other components of the Intelligence Community shall utilize the

Commission and its resulting report." E.O. 13328 Sec. 2(d).  Given the language of Executive Order

13328, all parties agree that the CIA has "utilized" the Commission, at least under the standard

definition of that word.  *See* Def.'s Br. in Resp. to Court's Order of July 5, 2006 at 2; Pl.'s Br. in

Resp. to Court's Order of July 5, 2006 ("Pl.'s Br.") at 7.  It is far from clear, however, that the word "utilized" in FACA § 4(b) should be given its common meaning.

Interpreting FACA, the Supreme Court has told us that "'[u]tilize' is a woolly verb" with a statutory meaning more precise than common parlance.  *Pub. Citizen*, 491 U.S. at 469.  The Court's comment was prompted by the nature of the putative advisory committee at issue in that case: the American Bar Association's Standing Committee on the Federal Judiciary, which regularly advises the Department of Justice on nominees for federal judgeships.  Finding that a "literal reading . . . would 'compel an odd result,'" the Court examined the statute, its backdrop, and its legislative history to find "other evidence of congressional intent to lend the term its proper scope."  *Id.* at 454.  The Supreme Court believed it was a "close question" whether the Department of Justice "utilized" the ABA Standing Committee as that word is used in FACA § 3.  *Id.* at 465.  But because "construing FACA to apply to the Justice Department's consultations with the ABA Committee would present formidable constitutional difficulties," the Supreme Court concluded that "Congress probably did not intend to subject the ABA Committee to FACA's requirements."  *Id.* at 467.  What "tip[ped] the balance decisively against FACA's application" was the Court's "cardinal principle" to avoid a construction of the statute that would raise doubts regarding its constitutionality.  *Id.* at 465.  "Our reluctance to decide constitutional issues is especially great where, as here, they concern the relative powers of coordinate branches of government."  *Id.* at 466.

The D.C. Circuit has had multiple occasions to address *Public Citizen* and to clarify its definition of "utilize."  In each instance, the question to be answered was whether a particular group qualified as an advisory committee under FACA § 3.  *See Byrd*, 174 F.3d at 239 (peer review panel convened by contractor to EPA)*; Animal Legal Defense Fund, Inc. v. Shalala*, 104 F.3d 424

(D.C. Cir. 1997) (committee established by the National Academy of Sciences); *Sofamor Danek Group, Inc. v. Gaus*, 61 F.3d 929 (D.C. Cir. 1995) (panel developing guidelines for physicians).  In these circumstances, the Circuit Court has explained that a committee is "established" when it is formed by a Government agency, and "utilized" when it is organized by a non-governmental entity "but nonetheless so closely tied to an agency as to be amendable to strict management by agency officials."  *Byrd*, 174 F.3d at 245 (citing *Shalala*, 104 F.3d 424).

      *Public Citizen* and its progeny provide some guidance, but they are not dispositive in this case.  In fact, it appears that no court has yet addressed the meaning of the word "utilized" in FACA § 4(b).  Plaintiff argues that this Court should apply the definition of "utilized" adopted by the Supreme Court in *Public Citizen*.  Pl.'s Br. at 6-7.  This argument makes sense; after all, "identical words used in different parts of the same statute are generally presumed to have the same meaning."  *IBP, Inc. v. Alvarez*, 546 U.S. 21, 126 S.Ct. 514, 523 (2005).  And Plaintiff is correct that, if the *Public Citizen* definition were applied to the Committee, it would not be exempt from FACA under § 4(b) because it was not subject to the CIA's management or control.  *See Shalala*, 104 F.3d at 430 ("the utilized test is a stringent standard, denoting something along the lines of *actual management or control* of the advisory committee") (internal quotations omitted).  However, this Court declines to apply to § 4(b) the definition of "utilized" adopted in *Public Citizen* and concludes, instead, that "utilized" in FACA § 4(b) has a meaning different from the meaning the Supreme Court assigned to the same word in FACA § 3.

      First, applying the narrow definition proposed by Plaintiff would contravene Congress's intent.  The Supreme Court and D.C. Circuit have read FACA's legislative history to indicate that Congress intended for FACA to be constrained in its application.  *Byrd*, 174 F.3d at 245

(noting that the Supreme Court had interpreted "utilized" in FACA § 3 "narrowly to prevent FACA from sweeping more broadly than the Congress intended."); *Sofamor*, 61 F.3d at 933 (noting that despite the "almost unfettered breadth" of the language in FACA § 3, "Congress did not intend for FACA to apply to every formal and informal consultation between the President or an Executive agency and a group rendering advice.") (internal quotations and citation omitted). Thus, the appellate courts have narrowly interpreted the threshold requirements of § 3 so that FACA's net is not too widely cast. Section 4(b), which acts to limit even further the number of advisory committees that are covered by FACA, should therefore be read in accordance with this understanding of Congress's intent — *i.e.*, it should be read *broadly* to ensure that FACA is *narrowly* applied. Employing in this case the narrow definition of "utilized" that the Supreme Court and D.C. Circuit have used in cases involving FACA § 3 would actually contravene congressional intent.

In addition, the reasoning in *Public Citizen* was based in large part on the ABA's status as a private, non-government institution. *See* 491 U.S. at 460. The D.C. Circuit's opinions interpreting *Public Citizen* have similarly focused on the public or private nature of the putative advisory committee. *See, e.g.*, *Shalala*, 104 F.3d at 429; *Food Chemical News v. Young*, 900 F.2d 328, 333 (D.C. Cir. 1990). Thus, the linguistic analyses in the prior decisions are not well suited to divining the meaning of the statutory phrase at issue here, which does not depend on whether the advisory committee in question is public or private. This Court concludes, therefore, that *Public Citizen* does not compel the application of the same definition of "utilized" to FACA § 4(b).

Second, adopting the *Public Citizen* definition here would run this case headlong into the precise "formidable constitutional difficulties" that the Supreme Court feared would result from

-12-

an expansive application of FACA. *See Pub. Citizen*, 491 U.S. at 466; *see also In re Cheney*, 406 F.3d at 728 (finding that the application of FACA to a committee within the Executive Office of the President would create "severe separation-of-powers problems."). It is a "cardinal principle" of statutory interpretation that "'where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress.'" *Pub. Citizen*, 491 U.S. at 446 (quoting *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988)). The constitutional problem at issue here is a potential violation of the principle of separation of powers. In deciding whether a statute disrupts the proper balance between the coordinate branches of government, courts should focus "on the extent to which it prevents the Executive Branch from accomplishing its constitutionally assigned functions. Only where the potential for disruption is present must [courts] then determine whether that impact is justified by an overriding need to promote objectives within the constitutional authority of Congress." *Nixon v. Administrator, Gen. Servs.*, 433 U.S. 425, 443 (1977) (internal citations and quotations omitted).

In the present case, the risk of applying FACA to the Commission is that it would interfere with the President's prerogative to consult with his advisors — free from limitations and restrictions imposed by Congress — on issues relating to his exclusive powers under Article II. Indeed, the Commission's mandate makes clear that its purpose was to assist the President in the execution of his constitutional powers:

> The Commission is established for the purpose of advising the President in the discharge of his constitutional authority under Article II of the Constitution to conduct foreign relations, protect national security, and command the Armed Forces of the United States, in order to ensure the most effective counterproliferation capabilities of the United States and

-13-

response to the September 11, 2001, terrorist attacks and the ongoing threat
of terrorist activity.

E.O. 13328 § 2.  The Court sees no overriding congressional purpose that justifies the interference that FACA's application in this case would have upon the President's ability to carry out his constitutional powers.  While the Center might find the background materials used by the Commission to be of value to its own mission, that mission pales in comparison to the mission of the Commission and its integral connection to the fundamental duties of the President himself.

Against this backdrop, the Court concludes that the word "utilized" in FACA § 4(b) should be read broadly.  The primary goal of statutory construction — the one to which all principles of interpretation ultimately lead — is to give full effect to Congress's intent.  *See, e.g.*, *Pub. Citizen*, 491 U.S. at 454-55.  By including § 4(b) in FACA, Congress expressed an intent to ensure that the statute's requirements would not interfere with or jeopardize the confidentiality of the workings of the CIA.  To adopt a narrower reading of utilized, such as the one suggested by Plaintiff, would contravene that congressional intent and potentially raise serious constitutional concerns.  Therefore, the Court reads the word "utilized" in FACA § 4(b) in accordance with its ordinary meaning: "to put to use."  Am. Heritage Dictionary 885 (3d ed. 1994).  And because Plaintiff concedes, as it must, that the CIA put the Commission to use, the Court concludes that the Commission had no obligation to release its background materials under §§ 10(b) or 11(a) of FACA, or to keep detailed minutes as required by § 10(c) of FACA.  Since the Commission had no such duty, neither does the Executive Office of the President or the current custodian of the materials, Mr. Lago.  As a result, the Complaint fails to state a claim upon which relief can be granted under Rule 12(b)(6).

## V.  CONCLUSION

Since the Commission was utilized by the CIA within the meaning of FACA § 4(b), the Court finds that the statute did not apply to its operations.  As a result, Plaintiff can prove no set of facts establishing that it has a valid cause of action against Mr. Lago based on an alleged violation of FACA.  The complaint will be dismissed for failure to state a claim upon which relief can be granted.  *See* Fed. R. Civ. P. 12(b)(6).  A memorializing order accompanies this Memorandum Opinion.

/s/
_____
ROSEMARY M. COLLYER
United States District Judge

DATE:  November 15, 2006